### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**-vs-**                                          **Case No.  6:02-cr-171-Orl-28KRS**

**JESSE ISSA MAALI**
**M. SALEEM KHANANI**
**KHAN ASLAM**
**SAEEDULLAH AWAN**
**MAHMOOD JAMAL**
**BIG BARGAIN WORLD, INC.**
**SS MART, INC.**
**JEANS UNLIMITED, INC.**
**DENIM UNLIMITED, INC.**
**BARAKAT CORPORATION**
**BARAKAT INTERNATIONAL, INC.**
**DAVID PORTLOCK**
_____

### SENTENCING ORDER AND MEMORANDUM

In a seventy-one count Third Superceding Indictment ("indictment"), the Government

charged David Portlock with fifty-three counts of knowingly encouraging or inducing aliens

to reside in the United States (Counts 1-53), one count of conspiring to conceal, harbor, or

shield from detection, or to encourage or induce aliens to illegally come to, enter, or reside

in the United States (Count 54), one count of money laundering (Count 55), one count each

of wire and mail fraud (Counts 56-57), one count of conspiring to attempt to evade federal

taxes (Count 58), and thirteen counts of attempting to evade federal taxes (Counts 59-71).

The charges against Mr. Portlock stemmed from a scheme in which he and others formed

shell companies in order to hire and pay undocumented workers and avoid state and federal

employment and income tax obligations.

On December 14, 2004, a jury found Mr. Portlock not guilty of all fifty-three counts of encouraging or inducing aliens to reside in the United States (Counts 1-53).  In addition, I subsequently granted a motion for judgment of acquittal filed by Mr. Portlock as to the count of money laundering (Count 55).  United States v. Maali, 358 F. Supp. 2d 1154 (M.D. Fla. Feb. 28, 2005).  As to all other counts charged in the Government's indictment, Mr. Portlock was found guilty and now stands before me for sentencing.[1]

## I.  OBLIGATIONS OF SENTENCING JUDGES AFTER BOOKER

In United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005), the Supreme Court "held that 'the Sixth Amendment right to trial by jury is violated where under a mandatory guidelines system a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury.'" United States v. Magluta, ___ F.3d ___, No. 03-10694, 2005 U.S. App. LEXIS 15322, at *41 (11th Cir. July 27, 2005) (quoting United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.) (emphasis omitted), cert. denied, 125 S. Ct. 2935 (2005)).  Additionally, Booker "established that it is error for [a] district court to sentence a defendant under a mandatory Guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." Id. (internal quotations and bracketing omitted).  As a consequence, the Supreme Court in Booker excised the two provisions from the Sentencing Act of 1984 ("Sentencing Act"), 18

---

[1]     Specifically, Mr. Portlock stands before me for sentencing on one count of conspiring to conceal, harbor, or shield from detection, or to encourage or induce aliens to illegally come to, enter, or reside in the United States (Count 54), one count each of wire and mail fraud (Counts 56-57), one count of conspiring to attempt to evade federal taxes (Count 58), and thirteen counts of attempting to evade federal employment or federal income taxes (Counts 59-71).

U.S.C. § 3551 et seq., which had the effect of making the United States Sentencing Guidelines ("guidelines") mandatory. See id. (citing Booker, 125 S. Ct. at 764). Thus, at present, the guidelines remain in effect but only in advisory form. Id.

In the wake of Booker, sentencing judges now bear four basic obligations in sentencing. First, judges must "calculate correctly the sentencing range prescribed by the [g]uidelines." United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005). Second, judges must take this sentencing range into consideration before imposing a sentence. See Crawford, 407 F.3d at 1178; United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005); Booker, 125 S. Ct. at 764-65;  see also Booker, 125 S. Ct. at 790 (Scalia, J., dissenting). Third, after consulting and considering the guidelines, judges must impose a "reasonable" sentence. See Crawford, 407 F.3d at 1178 ("After it has made [the guidelines] calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable . . . .") (citing Booker, 125 S. Ct. at 767). The extent to which a sentence is reasonable depends not only on the advisory sentencing range, but also on the numerous other factors listed under 18 U.S.C. § 3553(a), including "the need for the sentence imposed . . . to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), and "to protect the public from further crimes of the defendant," § 3553(a)(2)(C). See id.; Booker, 125 S. Ct. at 766-67 (explaining that the § 3553(a) "factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable"). Fourth, it must not be forgotten, in the midst of so much emphasis on the continued viability of the guidelines, that judges are required by the Sixth Amendment to refrain from treating the guidelines as mandatory

whether out of "ignorance, negligence, . . . defiance" or for any other reason. United States v. Rodriguez, 406 F.3d 1261, 1273 (11th Cir. 2005); see also Booker, 125 S. Ct. at 795 (Scalia, J., dissenting) (suggesting that "appellate review for 'unreasonableness' [might] preserve *de facto* mandatory Guidelines by discouraging district courts from sentencing outside Guidelines ranges"); United States v. Jaber, 362 F. Supp. 2d 365, 367 (D. Mass. 2005) ("'[A]dvisory' does not mean a regime without rules, or a return to the standardless sentencing which preceded the [Sentencing Reform Act].  Nor does it mean slavish application of the Guidelines under the guise of fair 'consideration,' an approach which is now unconstitutional.") (footnote omitted).

## II.  THE GUIDELINES SENTENCING CALCULUS

The determination of a sentencing range under the guidelines begins with the calculation of a "combined offense level" score and "criminal history points."  These scores are then located on a sentencing grid which indicates the defendant's advisory sentencing range.

### A.  Combined Offense Level

The first step to calculating a combined offense level is ascertaining which offense guidelines are applicable to the offenses of conviction.   United States Sentencing Commission, Guidelines Manual (hereinafter "USSG"), § 1B1.2(a) (Nov. 2000).[2]  Pursuant to the instructions provided within the applicable offense guidelines, an initial offense score for each offense of conviction is calculated by adding points assigned to the offense of

_____

[2]  See infra note 4.

conviction itself ("base offense level"), characteristics of the specific offense ("specific offense characteristics"), and any applicable adjustments "related to victim, role, and obstruction of justice."  USSG § 1B1.1(b)-(c).

Any counts "involving substantially the same harm" are then grouped.  USSG § 3D1.2.  This is done whenever: (a) "counts involve the same victim and the same act or transaction"; (b) "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"; (c) "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts"; or (d) "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."  USSG § 3D1.2.  In the event that counts are grouped, the offense level for the group is equal to "the highest offense level of the counts in the group." USSG § 3D1.3.

After any necessary grouping is completed, a "combined offense level" is calculated under a tortuous formula that begins by assigning units to each offense group.  Units are assigned as follows: (a) the group with the highest offense level is assigned one unit; (b) each group with an offense level that is equal to or is within one to four levels of the group with the highest offense level is assigned one unit; (c) each group with an offense level that is within five to eight levels of the group with the highest offense level is assigned one-half-unit; and (c) each group with an offense level that is nine or more levels less than the group

with the highest offense level is not assigned any units.  USSG § 3D1.4.  The units are then

translated into offense levels under the following set of conversions:

| | |
|---|---|
| 1 unit | 0 levels |
| 1 ½ units | 1 level |
| 2 units | 2 levels |
| 2 ½ units to 3 units | 3 levels |
| 3 ½ to 5 units | 4 levels |
| More than 5 units | 5 levels |

Id.  After the conversions are made, the final step in the calculation of a combined offense

level is adding the extra offense levels to the offense group with the highest offense level.

Id.

### B.  Criminal History Points

Criminal history points are calculated by adding point values assigned to various

elements of the defendant's criminal past.  See USSG § 4A1.1.

### C.  Sentencing Grid

The centerpiece of the Guidelines sentencing formula is the sentencing grid.  The

vertical axis of the grid contains all possible combined offense levels ranging from one to

forty-three, whereas the grid's horizontal axis is divided into six criminal history categories

which correspond to the range of all possible criminal history scores.  Below the horizontal

axis and to the right of the vertical axis are 258 possible sentencing ranges.  The appropriate

sentencing range on the grid is located at the point where, moving downward vertically from

the horizontal axis and rightward horizontally from the vertical axis, the criminal history score and combined offense level intersect.

### III.  STANDARD OF PROOF FOR APPLYING ENHANCEMENTS

Prior to Booker, it was "the settled law of this circuit that at sentencing, a federal defendant's due process rights are . . . satisfied by the preponderance of the evidence standard." United States v. Patti, 337 F.3d 1317, 1323 n.9 (11th Cir. 2004) (quoting United States v. Jackson, 57 F.3d 1012, 1019 (11th Cir. 1995)).  This fact remains unchanged after Booker.

In rendering the Guidelines advisory, Booker made no suggestion that judges would now be constitutionally required to find sentence-enhancing facts under a standard of proof more demanding than the preponderance of the evidence standard.  To the contrary, Booker made clear that "[i]f the Guidelines . . . could [have been] read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not [have] implicate[d] the [constitutional right to a trial by jury]."  125 S. Ct. at 750.   Thus, now that the Guidelines, not only can, but must be "read as merely advisory," I can only assume, as most other judges have, that there is no cause, constitutional or otherwise, for further disturbing the protocol for determining sentencing ranges under the Guidelines.  See United States v. Pirani, 406 F.3d 543, 552 n.4 (8th Cir. 2005); Cirilo-Munoz v. United States, 404 F.3d 527, 532-33 (1st Cir. 2005) (holding that the lower court's finding of an enhancement by a preponderance of the evidence was not erroneous because "Booker . . . preserved the use of judge-made findings by directing that the [G]uidelines hereafter be treated as advisory rather than mandatory."); United States

v. Yagar, 404 F.3d 967, 972 (6th Cir. 2005) ("[A] finding under the Guidelines must be based on reliable information and a preponderance of the evidence."); United States v. Guzman, 404 F.3d 139, 143 (2d Cir. 2005); United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of the Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."); McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005) ("The remedial portion of Booker held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the Sixth Amendment so long as the guideline system has some flexibility in application."); But see United States v. Pimental, 367 F. Supp. 2d 143, 153-54 (D.Mass. 2005) (finding the Fifth Amendment requires application of the beyond a reasonable doubt standard to enhancements); see also United States v. Huerta-Rodriguez, 355 F. Supp. 2d 1019, 1027 (D. Neb. Feb. 1, 2005).

This determination comes, however, with an important caveat. The variance between the preponderance of the evidence standard and the reasonable doubt standard must necessarily bear, to some extent, on the persuasive force of an advisory guidelines range. See United States v. Gray, 362 F. Supp. 2d 714, 723-24 (S.D. W. Va. 2005) (determining that a Guidelines sentencing range should be considered under a reasonable doubt standard after the range is calculated under the preponderance of the evidence standard); United States v. Coleman, 370 F. Supp. 2d 661, 668 (S.D. Ohio 2005) ("To the extent that an enhancement detracts from a defendant's liberty, its imposition should be considered with extreme scrutiny.").  To view the matter otherwise would be at odds with the long established

principle that determinations directly bearing on life and liberty must be met with more exacting scrutiny than other judicial determinations.  See, e.g., In re Winship, 397 U.S. 358, 372 (1970).[3]

## IV.  THE GUIDELINES CALCULATION

The baseline for calculating an advisory sentencing range under the Guidelines is the United States Probation Office's ("the Probation Office") presentence investigation report ("PSR").  The PSR contains a preliminary calculation of the Guidelines that functions to apprise the parties of possible sentencing issues and to aid the sentencing judge in determining the appropriate advisory sentencing range.  In this case, the Probation Office, using the 2000 edition of the Sentencing Guidelines,[4] recommended that Mr. Portlock be confined to the Federal Bureau of Prisons for a period of 97 to 121 months followed by 2 years supervised release.  The Probation Office also recommended that he pay a fine of $15,000 and restitution to the State of Florida in the amount of $259,978.  PSR, at 18.

---

[3]  As Booker reminded us, the effect of jury verdicts and enhancements of sentences is the same from the standpoint of the Sixth Amendment: liberty is lost.

[4]  There is no dispute in this case concerning which edition of the Sentencing Guidelines should be applied to calculate Mr. Portlock's advisory sentencing range. Ordinarily, courts should use the edition of the Guidelines "in effect on the date that the defendant is sentenced . . . ." 18 U.S.C. § 3553(a).  "The Constitution's Ex Post Facto Clause, however, prevents the Government from imposing additional penalties for crimes that have already been committed.  United States v. Simmons, 368 F.3d 1335, 1338 (11th Cir. 2004) (citing U.S. Const. art. I, § 9, cl. 3).  "Consequently, although courts must presumptively apply [the edition of the Guidelines in effect] at the time of sentencing, they may not do so," in a case such as this one, in which that edition "would lead to imposition of a harsher penalty than that to which the defendant was subject at the time of [his] offense[s]. In such cases, the [edition of the Guidelines] applicable at the time of the offense[s] must be applied."  Id.  Here, that edition is the November 2000 edition of the Guidelines.

Mr. Portlock has filed numerous objections to the PSR.  For the reasons set forth below, those objections must be sustained in part and overruled in part.

### A.  IMMIGRATION OFFENSE LEVEL (GROUP I)

The Probation Office arrived at an offense level of twenty-five (25) for Mr. Portlock's immigration offense (Count 54) by adding together a base offense level of twelve (12), USSG § 2L1.1(a)(2); a specific offense characteristic score of nine (9) on the basis that Mr. Portlock conspired to harbor one hundred or more aliens, USSG § 2L1.1(b)(2)(C); an adjustment for role in the offense of two (2) on the basis that Mr. Portlock used a special skill in a manner that significantly facilitated the commission or concealment of the immigration offenses, USSG § 3B1.3; and an adjustment for role in the offense of two (2) on the basis that Mr. Portlock "was an organizer, leader, manager, or supervisor in [the] criminal activity," USSG § 3B1.1(c).  Mr. Portlock objects to all of the enhancements applied by the  Probation Office to calculate the offense level for his immigration offense.

### 1.  Specific Offense Characteristic: Number of Aliens Smuggled, Harbored, or Transported (§ 2L1.1(b)(2)(C))

The immigration guideline provides for enhancements based on the "number of unlawful aliens" that the defendant "smuggled, transported, or harbored."  USSG § 2L1.1(b)(2).  Mr. Portlock argues that the Probation Office erred in applying this enhancement because he did nothing to facilitate the smuggling, harboring, or transporting of aliens.  Doc. 1006, at 3-4.  There is no dispute that Mr. Portlock is correct to the extent that he denies ever having smuggled or transported aliens.  The Government, however, maintains that the Probation Office was correct in concluding that Mr. Portlock conspired to

*harbor* one hundred or more aliens. Although Mr. Portlock has not directly called the scope of § 2L1.1(b)(2)(C) into question, the fact of Mr. Portlock's conviction for "conspiring to conceal, *harbor*, or shield [aliens] from detection, or to encourage or induce aliens to illegally come to, enter, or reside in the United States," combined with his argument that he did not commit the offense of harboring, necessarily raises the question of whether harboring encompasses the conduct of which he was no doubt convicted and, thus, the applicability of § 2L1.1(b)(2)(C).[5]

### a. The Meaning of Harboring Under § 1324(a)[6]

The uncertainty surrounding the meaning of harboring initially arises from the fact that neither the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., nor the Immigration Sentencing Guideline, USSG § 2L, defines the term. Where lawmakers fail to define a term, the first resort of the courts should be to the term's "common usage." Consol. Bank, N.A. v. United States Dep't of the Treasury, 118 F.3d 1461, 1464 (11th Cir. 1997); see also "Shotz v. City of Plantation, 344 F.3d 1161, 1167 (11th Cir. 2003) ("The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous

---

[5] Mr. Portlock's arguments, at times, appear geared not so much to this Court but to the Eleventh Circuit. See, e.g., Objections to PSR, Doc. 1006, at 4 ("[N]othing David Portlock did had any bearing on the intent of [the aliens] to stay in the United State or to smuggle them, transport them, or harbor them.").

[6] Although this is not the first time that the meaning of harboring has emerged as an issue in this case, it is the first time that the term must be defined independently of other terms contained in 8 U.S.C. § 1324(a). See Court's Instructions to the Jury, Doc. 780, at 19 (instructing the jury that "[t]o conceal, harbor or shield from detection includes any knowing conduct by the Defendant tending to substantially facilitate an alien's escaping detection as an illegal alien, thereby remaining in the United States illegally.").

meaning with regard to the particular dispute.") (internal quotations and citations omitted). In determining "the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." <u>CBS Inc. v. PrimeTime 24 Joint Venture</u>, 245 F.3d 1217, 1223 (11th Cir. 2001).   In this instance, however, dictionary definitions function only to highlight the lack of clarity in the definition of "harboring."  <u>See, e.g.</u>, *Webster's Third New International Dictionary* 1031 (1981) (defining "harbor" as "to give shelter or refuge to"[7] as well as "to receive clandestinely and conceal").[8]

In light of this lack of clarity, analysis must give way to "traditional tools of statutory construction."  <u>Shotz</u>, 344 F.3d at 1167 ("If the statutory [term] is not entirely transparent, [courts] employ traditional canons of construction before 'reverting to legislative history . . . .'") (internal quotations and bracketing omitted).   Although the ultimate task here is to interpret "harboring" as used in § 2L1.1, the use of the term as an immigration violation originally derives from 8 U.S.C. § 1324(a). Thus, it is there that the task of construction must begin.

---

[7]  <u>See also</u> American Heritage Dictionary (4th ed. 2000) (online version) (defining "harbor" as "to give shelter to"); Merriam-Webster's Collegiate Dictionary 529 (10th ed. 1999) (defining "harbor" as "to give shelter or refuge to").

[8]  Other dictionaries demonstrate an ambivalence similar to that of *Webster's.*  <u>See, e.g.</u>, Black's Law Dictionary 847 (4th ed. 1951) (defining "harbor" as "[t]o afford shelter to, or give a refuge to" as well as "[t]o receive clandestinely and without lawful authority a person for the purpose of so concealing him that another having a right to the lawful custody of such person shall be deprived of the same" and explaining that the term "may be aptly used to describe the furnishing of shelter, lodging, or food clandestinely or with concealment, and under certain circumstances may be equally applicable to those acts divested of any accompanying secrecy"); Black's Law Dictionary 733 (8th ed. 2004) (providing different definitions for "harboring" and "harboring an illegal alien").

Section 1324(a) provides as follows:

**Bringing in and harboring certain aliens**
\* \* \*
(A) Any person who–
(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;
(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or
(v) (I) engages in any conspiracy to commit any of the preceding acts, or
(II) aids or abets the commission of any of the preceding acts,
shall be punished as provided in subparagraph (B).

The principal difficulty in construing "harboring" under § 1324(a) arises from the provision's two distinct uses of the term.

On the one hand, the title of the section, *Bringing in and harboring certain aliens*, suggests that all of the conduct proscribed under § 1324(a) falls into either one of two categories: (1) the bringing of aliens into the United States; or (2) the harboring of aliens once they already in the United States.  Under this theory, the "bringing in" of aliens would primarily include smuggling, whereas harboring would "encompass [all] conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." United States v. Kim, 193

F.3d 567, 574 (2d Cir. 1999).  At a minimum, such conduct would include all of the offenses delineated in § 1324(a)(1)(A)(iii), since those offenses involve actions taken toward aliens once they are already present in the United States.[9]

This construction of "harboring" fails, however, to accord any meaning to "harbor" as it is used in § 1324(a)(1)(A)(iii), and, thus, violates the basic principle of construing a "statute 'so that [none of its] words shall be discarded as meaningless, redundant, or mere surplusage.'"  Shotz v. City of Plantation, 344 F.3d 1161, 1173 (11th Cir. 2003) (quoting United States v. DBB, Inc., 180 F.3d 1277, 1285 (11th Cir. 1999); see also Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").  Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings . . . .").  If "harboring" is defined to encompass the acts of "concealing" and "shielding [aliens] from detection," § 1324(a) would be left to read that it is criminal for "any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States . . . **conceals, [conceals or shields from detection], or shields from detection**, such alien in any place, including any building or any means of transportation."[10]

Cf. United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir. 1977) (determining that the

---

[9]  The case could be made that encouraging or inducing aliens to "come to, enter, or reside in the United States," 8 U.S.C. § 1324(a)(1)(A)(iii), is more akin to the "bringing in" of aliens than the "harboring" of them.

[10]  Reversing the substitution, the statute would make it criminal for "any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States . . . **[harbors], harbors, or [harbors]**, such alien in any place, including any building or any means of transportation."

synonymous construction of "shield from detection" and "conceal" under § 1324(a) would be redundant).  To avoid the redundancy of this construction, "harbor" must be interpreted as having a meaning distinct from "conceal" and "shield from detection"–an objective that can only be accomplished by defining "harbor" narrowly as in "to afford[] lodging [or] shelter to."[11]  Black's Law Dictionary 733 (8th ed. 2004).

This is not to say, however, that "harboring" must mean "to give shelter to" for all purposes related to § 1324(a).  The flip side of the analysis just set forth is that, if "harboring" is defined only as giving shelter to, the title to § 1324(a) would cease to cover the scope of the conduct proscribed by § 1324(a).[12]

_____

[11]  Under this construction, there would be potential overlap between the three types of conduct proscribed under § 1324(a)(1)(A)(iii).  This, however, poses no problem so long as each term is accorded a distinct meaning.  The act of providing shelter, even to a person known to be an illegal aliens, does not necessarily entail concealing or sheltering that alien from detection.  Likewise, as the Government's arguments in this case have made clear, it is possible to conceal or shield aliens from detection without sheltering them.  The distinction between concealing and shielding poses a more difficult problem.  However, in this circuit, there is no question that the terms have different meanings under § 1324. As the former Fifth Circuit explained:

> Although "shield" and "hide" may in some contexts be synonymous, in the context of section 1324 they are not.  Section 1324 forbids attempts "to conceal, harbor, or shield from detection."  Were "shield from detection" used synonymously with "hide" then "conceal" would be redundant.

United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir. 1977); see also Bonner v. City of Prichard, 661 F,2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting all Fifth Circuit holdings prior to September 30, 1981 as binding precedent).

[12]  For example, if harboring were defined as only the provision of shelter or housing, neither the "bringing" of aliens into the United States nor the harboring of them would include shielding aliens from detection.  The whole point of shielding aliens from detection is to prevent their detection once they are in the United States.

The only solution to this interpretive predicament is to take a contextual approach to the meaning of "harboring."  If "harboring" is used generally to refer to multiple § 1324(a) offenses, then the term should be interpreted to mean, at a minimum, all of the conduct contained under § 1324(a)(1)(A)(iii).  See United States v. Zheng, 306 F.3d 1080, 1086 (11th Cir. 2002) (referring to harboring in the general sense of facilitating an alien's presence in the United States).  On the other hand, if "harboring" is used to refer to a particular offense, then the term should be interpreted to mean sheltering and nothing more.  See United States v. De Evans, 531 F.2d 428, 430 (9th Cir. 1976),(finding that the purpose of § 1324(a) "is best effectuated by construing 'harbor' to mean 'afford shelter to'"); Cantu, 557 F.2d at 1180.  By drawing on both definitions of "harboring," this flexible construction avoids the difficulties that arise if only one of the definitions of "harboring" obtains.

### c. The Meaning of Harboring Under § 2L1.1

The question of what "harboring" means arises not only in relation to § 2L1.1(b)(2) but also to § 2L1.1 as a whole.  Just as § 2L1.1(b)(2) refers only to the offenses of "smuggl[ing], transport[ing], [and] harbor[ing]," so, too, does the title of § 2L1.1 and all of its various other provisions.  USSG § 2L1.1 (entitled "Smuggling, Transporting, or Harboring an Unlawful Alien.")

While neither § 2L1.1 Nor its commentary provides any direct clues to the meaning of "harboring," the anti-redundancy canon militates against employing the broad definition of harboring.  To avoid the problem of redundancy under § 2L1.1, "smuggling, transporting, [and] harboring" should each be defined to have distinct meanings, something which cannot be accomplished by employing the broad definition of "harboring."  Although "smuggling"

clearly does not fall under "conduct tending substantially to facilitate an alien's *remaining* in the United States," Kim, 193 F.3d at 574 (emphasis added), "transporting" aliens once they are already in the United States does.  See Zheng, 306 F.3d at 1087 ("Congress . . . chose to penalize employers for hiring illegal aliens and harboring them from detection by providing transportation and housing for them.").  Thus, were the broad definition of "harboring" employed in § 2L1.1, all references to "transporting" in the guideline would be rendered meaningless.[13]

### d.  Application of the Most Analogous Offense Guideline (§ 2X5.1)

Notwithstanding the unworkability of using the broad definition of "harboring" in § 2L1.1, there is no need to evaluate the merits of a narrower definition.[14]  Even assuming that the narrowest definition of "harboring" were employed, thus leaving Mr. Portlock's immigration offense without an offense guideline, the Guidelines provide for application of the "most analogous offense guideline."  USSG § 2X5.1 (instructing to apply the "most analogous" guideline to offenses "for which no guideline expressly has been promulgated").  In light of this instruction, Mr. Portlock's immigration offense would have to be scored under § 2L1.1 anyway.  Not only is § 2L1.1 the only guideline that addresses offenses proscribed

---

[13]   The problem is not solved by interpreting "transporting" to mean only the "transporting" of aliens into the United States; this would serve only to exchange one redundancy for another by making transporting redundant of smuggling.

[14]  Were it not for § 2X5.1, the rule of lenity likely would have counseled in favor of adopting the narrow definition urged by Mr. Portlock even if that definition could not have been established by applying tools of statutory construction.  See Holloway v. United States, 526 U.S. 1, 12 n.14 (1999) (instructing that the rule of lenity should be applied when courts can only "guess" as to what the legislature intended).

under § 1324(a), but the acts of smuggling, harboring, and transporting are also highly analogous to the offenses of concealing and shielding aliens from detection.  Finally, the Guidelines are clear that the "incorporation of a guideline by cross-reference requires incorporation of the '*entire*' cross-referenced guideline, including 'the base offense level, *specific offense characteristics*, cross references, and special instructions.'" United States v. Maloney, 406 F.3d 149, 152 (2d Cir. 2005) (quoting USSG § 1B1.5(b)(1)) (emphasis added).  Thus, the entirety of § 2L1.1, including the enhancement in § 2L1.1(b)(2), applies to the immigration offenses proscribed under § 1324(a), notwithstanding the fact that the enhancement refers only to the offenses of smuggling, transporting, and harboring.

The only remaining question is whether Mr. Portlock's immigration offense involved one hundred or more aliens.  The record plainly indicates that it did.  At a minimum, Mr. Portlock set up sham companies which had the aim and effect of concealing and shielding at least one hundred aliens from detection.  See Zheng, 306 F.3d at 1087 (noting the "overlap" between the misdemeanor offense of hiring and employing unauthorized aliens and § 1324(a)).  The larger conspiracy that he participated in, moreover, involved paying aliens off the books and further concealing and shielding them from detection by setting up an alarm system to warn the aliens in case of immigration raids.  See USSG § 1B1.3(a)(1)(B) (instructing that conduct relevant to determining an advisory sentencing range includes, "in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for

that offense, or in the course of attempting to avoid detection or responsibility for that offense"). In light of these facts, the enhancement in § 2L1.1(b)(2)(C) must be applied.[15]

### 2. Role in the Offense: Special Skill (§ 3B1.3)

Under USSG § 3B1.3, the use of a "special skill . . .[to] . . . significantly facilitate[] the commission or concealment of the offense" results in an offense level enhancement of two points. Mr. Portlock does not dispute that he is an accountant and that he functioned in that capacity during the period that he and his coconspirators devised and operated a scheme to conceal undocumented employees. Rather, he simply submits that his skill as an accountant did not "did not significantly facilitate the [undocumented employees'] ability to stay in the United States." Doc. 1006, at 5.

This contention, however, is simply not supported by the record. As the Probation Office concluded, the evidence presented at trial established that Mr. Portlock used his skill as an accountant to set up "shell companies" in an attempt to disguise payments to undocumented workers as ordinary expenses. The result and design of this effort were to significantly facilitate the concealment of the workers' unlawful presence in the United States. See United States v. Fritzson, 979 F.2d 21, 22 (2d Cir. 1992) (finding that accountant's knowledge of tax preparation and filing exceeded "the knowledge of the

---

[15] In objecting to the application of § 2L1.1(b)(2)(C), Mr. Portlock spent much of argument denying that he did anything affirmative to encourage or induce any aliens to reside in the United States. Even if I were to accept this argument, the fact remains that the evidence clearly establishes that Mr. Portlock engaged in efforts to conceal and shield aliens from detection.

average person" and his "filing of . . . complementary corporate documents was a creative step plainly spawned by expertise").

### 3.  Role in the Offense: Organizer, Leader, Manager, or Supervisor of Criminal Activity (§ 3B1.1(c))

In an attempt to rebut the Probation Office's conclusion that he was an organizer, leader, manager, or supervisor of a scheme to hire and conceal illegal aliens, Mr. Portlock contends that there was no "nexus" between the scheme and his position as an accountant. This contention has no merit.  As already noted, Mr. Portlock used his skill as an accountant to set up sham companies in an effort to conceal the presence of illegal aliens.  The evidence presented at trial showed, moreover, that this particular part of the scheme was the brain child of Mr. Portlock.  There is, therefore, no question that he was a key organizer of the scheme.

### 4.  Conclusion: Total Offense Level for Immigration Offenses

Having overruled all of Mr. Portlock's objections to the Probation Office's calculation of the offense level for his immigration offense, I determine that the applicable offense level for that offense is twenty-five (25).

### B.  GROUPING

The Probation Office grouped Mr. Portlock's offenses into three groups: (1) Mr. Portlock's immigration offense; (2) his mail and wire fraud offenses; and (3) his tax violations.  Mr. Portlock raises no objection to the placement of his immigration offense into its own group but he contends that his fraud and tax violations should be grouped together

because the violations involve basically the same harms.  Mr. Portlock's argument depends upon analysis of USSG § 3D1.2(d).

Under § 3D1.2(d), the grouping of "[c]ounts involving offenses to which different offense guidelines apply" depends on two factors.  USSG § 3D1.2 cmt. n.6.  First, the offense levels for the counts must be "determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm."  USSG § 3D1.2(d).  Second, the offenses must be "of the same general type."  USSG § 3D1.2 cmt. n.6.

### 1.  Determination of Offense Levels

There is no question in this case that the offense levels for fraud and tax evasion are "determined largely on the basis of the total amount of harm or loss" that arose from those offenses.  Twenty-one (21) of the twenty-seven (27) levels assigned to the tax offense group and thirteen (13) of the twenty-seven (27) levels assigned to the fraud group are the product of loss calculations.  See PSR, at 8-10.  In each group, moreover, the score assigned to financial loss is easily the greatest single factor in the offense level calculation.[16]  Id.

### 2.  Same General Type Requirement

The commentary to § 3D1.2(d) does not define "same general type" but instructs that the phrase "is to be construed broadly."  USSG § 3D1.2 cmt. 6.  In addition, the commentary explains that "[t]he same general type of offense . . . would include, for example, larceny,

---

[16] In the PSR, the next greatest offense score for both the tax and fraud groups is two (2).  PSR, at 8-10.

embezzlement, forgery, and fraud."[17]  Id.  Although the commentary fails to specify what category the four exemplary offenses fall under or otherwise explain why the offenses may be deemed of "the same general type" for grouping purposes, the illustration nonetheless offers some insight into the meaning of "same general type."

In this regard, three aspects of the commentary's illustration are noteworthy.  First, "larceny, embezzlement, forgery, and fraud" share no one formal element in common.  While each offense typically involves the unlawful taking of property, only larceny and embezzlement are, by definition, property crimes.  See Black's Law Dictionary 561, 677, 685, 896 (8th ed. 2004) (defining only larceny and embezzlement as necessarily involving the unlawful taking of property); see also United States v. Williams, 154 F.3d 655, 657 n.1 (6th Cir. 1998) (referring to the four offenses as "property crimes, broadly defined").  Similarly, whereas embezzlement, forgery, and fraud are all types of fraud, the same is not true of larceny.  See Black's Law Dictionary 897 (8th ed. 2004) (defining "larceny" as "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently").  Second, the four offenses are not classified as the same type of offenses "elsewhere in the Guidelines."  Williams, 154 F.3d at 657 n.1.  For instance, while embezzlement is defined under Chapter 2, Part B of the Guidelines as an offense involving property, forgery is characterized as an offense involving fraud or deceit under Chapter 2,

---

[17]  In the latest edition of the Guidelines, United States Sentencing Commission, Guidelines Manual, (Nov. 2004), this illustration is omitted.  See USSG § 3D1.2 cmt. n.6. Presumably, this is because a single guideline, USSG § 2B1.1, now covers "larceny, embezzlement, forgery, and fraud," thus rendering inapplicable the instruction in the commentary to § 3D1.2 regarding "[c]ounts involving offenses to which different offense guidelines apply."

Part F.[18]  See Williams, 154 F.3d at 657 n.1 ("Presumably, the drafters added this illustration of 'same general type' in order to reinforce the notion that property crimes, broadly defined, are to be grouped, notwithstanding the fact that certain of the offenses listed do not fall within the definition of property crimes elsewhere in the Guidelines.").  Lastly, the loss-to-offense level ratios for the offenses are not the same.  Compare USSG § 2B1.1(b)(1) (loss table for embezzlement and larceny) and USSG § 2F1.1(b)(1) (loss table for fraud and forgery).  In short, these three aspects of the commentary's illustration at least signal what is *not* required for offenses to be of the "same general type" for purposes of grouping and, thereby, underscore the instruction that "the 'same general type' of offense is to be construed *broadly.*"  USSG § 3D1.2 cmt. n.6 (emphasis added).

In arguing that Mr. Portlock's tax and fraud offenses should not be grouped, the Government does not endeavor to construe the terms of § 3D1.2(d) or its accompanying commentary.  Instead, the Government merely contends that tax evasion and fraud: (1) involve "different victims"; (2) are scored under different loss tables; and (3) otherwise should not be grouped because grouping would result in no punishment for Mr. Portlock's tax evasion.[19]  See Letter from Cynthia A. Hawkins, Assistant United States Attorney, to David

---

[18]  Under the most recent version of the Guidelines, both offenses are now defined even more broadly as "basic economic offenses."  USSG Ch. 2, pt. B (Nov. 2004).

[19]  The Government's basic position that fraud and tax evasion are not groupable offenses under § 3D1.2(d) is consistent with the prevailing view among circuit courts.  See United States v. Martin, 363 F.3d 25, 44 (1st Cir. 2004); United States v. Shevi, 345 F.3d 675, 680-81 (8th Cir. 2003); Weinberger v. United States, 268 F.3d 346, 353-355 (6th Cir. 2001); United States v. Lindsay, 184 F.3d 1138, 1142-43 (10th Cir. 1999). But see United States v. Gordon, 291 F.3d 181, 192 (2d Cir. 2002) (explaining that the offenses should be grouped under § 3D1.2).

J. Salce, U.S. Probation Office, of May 3, 2005, 4-5 (hereinafter "AUSA Letter").  In my view, none of these arguments possesses sufficient merit to foreclose the grouping of tax evasion and fraud under § 3D1.2(d).

The Government's first two arguments, while presumably seeking to establish that tax evasion and fraud are not sufficiently the "same" for the purposes of § 3D1.2(d), pays little heed to the guidance set forth in that guideline and its commentary.[20]  First, in regard to the Government's emphasis on "different victims," the Second Circuit has persuasively observed that "[i]t would be wrong . . . to project a same-victim requirement into § 3D1.2(d) [when] . . . no such requirement is mentioned in [the guideline]."  United States v. Napoli, 179 F.3d 1, 9 (2d Cir. 1999).  The "omission" of any reference to victims in § 3D1.2(d) is particularly significant "in light of the fact that [§ 3D1.2(a) and (b)] both explicitly require harm to the 'same victim.'"  Id.  Furthermore, "the [b]ackground to § 3D1.2's [c]ommentary states that counts 'involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in [§ 3D1.2(d)].'"  Id. (emphasis removed).  "Finally, [the commentary] to [§ 3D1.2(d)] gives examples of counts that should be grouped under that subsection, including cases in which a 'defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, *each from a different victim.*'"  Id.

_____

[20]  The Government has also argued, more generally, that the harms of tax evasion and fraud are not the same.  See, e.g., Tr. June of 13, 2005, Oral Arg., at 23 ("[T]he harms attributable to each crime are dissimilar.") (relying on United States v. Peterson, 312 F.3d 1300 (10th Cir. 2002)).  This argument is decidedly circular.  In essence, the Government contends that tax evasion and fraud should not be grouped under a guideline which instructs to group counts involving "substantially the same harm," USSG § 3D1.2, because the counts do not involve the same harm.

The Government's emphasis on the differences in the fraud and tax evasion loss tables is also misplaced.  As earlier noted, the losses for "larceny and embezzlement" and the losses for "forgery and fraud" are calculated under distinct loss tables, yet are specifically set forth in the guideline's commentary as groupable offenses.  <u>Compare</u> USSG §§ 2B1.1 (loss table for theft) <u>with</u> 2F1.1(b)(1) (loss table for fraud).  <u>See also</u> USSG § 3D1.3(b) (providing that "[w]hen . . . offenses of the same general type to which different guidelines apply (*e.g., theft and fraud*) [are grouped pursuant to § 3D1.2(d)] the offense guideline that produces the highest offense level [should be applied]") (emphasis added).[21]

Finally, the Government's contention  that grouping would result in no penalty being imposed for Mr. Portlock's tax evasion is an argument not so much against the grouping of tax evasion and fraud as an argument against the practice of grouping itself.  That is to say, grouping, to one degree or another, always involves the reduction or removal of a penalty for an offense.  <u>See</u> USSG § 3D1.3 cmt. n.4 ("Sometimes the rule specified in this section may not result in incremental punishment for additional criminal acts because of the grouping rules.").  My role, however, is not to question the wisdom of this or any other practice

_____

[21]  Although the variation in the fraud and theft tables no longer remains in the latest edition of the Guidelines, the fact remains that § 3D1.2(d) originally contemplated the grouping of offenses with different loss tables.  One might argue, of course, that such inference should no longer obtain now that the fraud and theft tables are symmetrical.  Yet, had the Sentencing Commission intended to defeat the inference that offenses with different loss tables can or should be grouped, it must be assumed that they would have done so expressly, rather than merely allowing for one inference to be countered with another.  It bears noting, moreover, that, even if the Sentencing Commission somehow intended to effect a substantive change by disallowing the grouping of offenses with different loss tables, the Ex Post Facto Clause would nonetheless require the application of the approach prescribed in the year 2000.  <u>United States v. Simmons</u>, 368 F.3d 1335, 1338 (11th Cir. 2004).

prescribed by the Guidelines but to calculate an advisory sentencing range in accordance with the Guidelines as they are written.[22]

Under this approach, I conclude that a fair reading of § 3D1.2(d) demands that Mr. Portlock's fraud and tax offenses be grouped.  See United States v. Gordon, 291 F.3d 181, 189-92 (2d Cir. 2002) (explaining that tax evasion and fraud should be grouped under § 3D1.2(d) and holding that § 3D1.3 requires that quantifiable offenses be grouped under § 3D1.2(d) rather than § 3D1.2(c)).  As one court has observed, tax evasion is, at its essence, an "attempt to defraud the government by evading [taxes]."  United States v. Robinson, 974 F.2d 575, 578 (5th Cir. 1992) (internal quotations and citation omitted); see also Black's Law Dictionary 1501 (8th ed. 2004) (defining tax evasion as "[t]he willful attempt to defeat or circumvent the tax law in order to illegally reduce one's tax liability"); 26 U.S.C. § 7201 (tax evasion statute).[23]  Taking this basic fact together with the instruction in the commentary to § 3D1.2(d) to construe "same general type" broadly, I find that tax evasion and fraud are offenses of "the same general type."[24]

---

[22]  An additional reason sometimes put forth for not grouping tax evasion and fraud counts is that the offenses involve "different conduct."  See, e.g., United States v. Martin, 363 F.3d 25, 44 (1st Cir. 2004).  With respect, I do not find this distinction persuasive.  Any two offenses will necessarily involve "different conduct"; otherwise, they would not be two offenses but one.

[23]  Indeed, the Eleventh Circuit has, on at least one occasion, used the terms "tax evasion" and "tax fraud" synonymously.  Blohm v. Commissioner, 994 F.2d 1542, 1554 (11th Cir. 1993) (referring to a conviction for tax evasion under 26 U.S.C. § 7201 as "a criminal tax fraud conviction").

[24]  In the alternative, the crimes of fraud and tax evasion may also be broadly classified as property crimes, given that both offenses are generally committed with an aim to effect deprivations of property.  As the illustration of "larceny, embezzlement, forgery, and

## C.  TAX AND FRAUD OFFENSES (GROUP II)

When counts that "involve offenses of the same general type to which different guidelines apply" are grouped pursuant to § 3D1.2(d), the Guidelines instruct that the offense level for the grouped counts is determined by applying "the offense guideline that produces the highest offense level."  USSG § 3D1.3(b).  In this instance, the offense level for Mr. Portlock's tax offenses cannot possibly be exceeded by the offense level for his fraud offenses.[25]  Thus, the determination of the offense level for his fraud and tax offenses hinges completely on application of the tax guideline.

The Probation Office arrived at an offense level score of twenty-nine (27) for Mr. Portlock's tax offenses by adding together a base offense level of twenty-one (21) on the basis that Mr. Portlock's tax offenses resulted in a "tax loss" of approximately $2.7 million, USSG §§ 2T1.1(a)(1), 2T4.1(P); a specific offense characteristic score of two (2) on the basis that the tax offenses "involved sophisticated concealment," USSG § 2T1.1(b)(2); an adjustment for role in the offense of two (2) on the basis that Mr. Portlock used a special skill in a manner that significantly facilitated the commission or concealment of the tax offenses, USSG § 3B1.3; and an adjustment for role in the offense of two (2) on the basis that Mr.

_____

fraud" makes clear, the fact that neither fraud nor tax evasion requires an actual deprivation of property is not necessarily determinative.

[25] Two factors compel this determination. First, the Probation Office arrived at offense levels of twenty-seven (27) for both Mr. Portlock's fraud offenses as well as for his tax offenses. Second, the only objection raised by Mr. Portlock in response to the Probation Office's calculation of the offense level for his tax offenses is also an objection that he has raised in response to the calculation of the offense level for his fraud offenses.  If one objection is granted, the other must also be granted, and the resultant decrease in both offense levels would be the same.

Portlock "was an organizer, leader, manager, or supervisor in [the] criminal activity," USSG

§ 3B1.1(c).  Mr. Portlock's only objection to the calculation of the offense level for his tax

offenses is to the Probation Office's determination that his tax offenses resulted in a loss of

$2.7 million.

The tax guideline, USSG § 2T1.1, "provides sentencing standards for 'Tax Evasion;

Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns,

Statements, or Other Documents.'" United States v. Gordon, 291 F.3d 181, 187 (2d Cir. 2002)

(quoting § 2T1.1).  "Pursuant to USSG § 2T1.1(a), the base offense level for tax evasion, or

the payment thereof, is the greater of the 'level from § 2T4.1 (Tax Table) corresponding to the

tax loss' or 6, if there is no tax loss."  United States v. Hunerlach, 197 F.3d 1059, 1069 (11th

Cir. 1999) (quoting the tax guideline).

At trial, the Government prepared two calculations of "tax loss."  The first calculation,

which made no account for any deductions that Mr. Portlock and his coconspirators could

have claimed had they complied with the tax laws, estimated the "tax loss" from Mr. Portlock's

tax offenses to be approximately $2.7 million.  The second calculation, which accounted for

the deduction of "off the books wages" that Mr. Portlock and his coconspirators paid to

undocumented employees, estimated the loss to be in the range of $1.2 million.  Mr. Portlock

did not submit a calculation of estimated "tax loss" either at trial or at sentencing.

In determining the base offense level for Mr. Portlock's tax offenses, the Probation

Office adopted the larger of the Government's two estimates.  Using this loss estimate, the

Probation Office determined, pursuant to the Tax Table in § 2T4.1, that the base offense level for Mr. Portlock's offenses was twenty-one (21).[26]

Mr. Portlock objects to the Probation Office's reliance on the larger "tax loss" estimate and contends that the "tax loss" resulting from his offenses was, at the very most, $1.2 million. If granted, Mr. Portlock's objection would warrant at least a two-level reduction in the base offense level for his tax offenses.[27]  In response, the Government maintains that Mr. Portlock should not get the benefit of deductions after the fact of his tax evasion.

Analysis begins by examining the plain language of the tax guideline.  Under the tax guideline, "tax loss" is calculated pursuant to § 2T1.1(c)(1)(A), which provides that:

> If the [tax] offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, *unless a more accurate determination of the tax loss can be made*.

USSG § 2T1.1(c)(1)(A) (emphasis added).  The tax guideline provides no explanation of what is meant by "a more accurate determination" or what data may be factored into such a determination.  At least one court, however, has determined that the plain import of the clause is that a "sentencing court need not base its tax loss calculation on gross unreported income if it can make 'a more accurate determination' of the intended loss and that determination of

---

[26]  The tax table assigns a base offense level of twenty-one (21) for any amount more than $2.5 million but less than or equal to $5 million.  USSG § 2T4.1(P).

[27]  Under the tax table, a "tax loss" that exceeds $950,000 but is less than or equal to $1.5 million yields a base offense level of nineteen (19).  USSG § 2T4.1(N)-(O).

the tax loss involves giving the defendant the benefit of legitimate but unclaimed deductions."[28]

United States v. Martinez-Rios, 143 F.3d 662, 671 (2d Cir. 1998); accord United States v. Gordon, 291 F.3d 181, 187 (2d Cir. 2002).  I agree with this analysis and add that the very definition of "loss" contemplates the consideration of unclaimed deductions.  After all, neither the federal government nor the State of Florida can claim to have *lost* revenue that they never would have collected had Mr. Portlock and his coconspirators not evaded their taxes.  See Webster's Third New International Dictionary 1338 (1981) (defining "loss" as "the harm or privation resulting from losing or being separated from something");[29] United States v. Bishop, 291 F.3d 1100, 1116 (9th Cir. 2002) (refusing to reduce tax loss by amount of legitimate but unclaimed deductions where  defendant "did not offer such information at the time of sentencing"); United States v. Sullivan, 255 F.3d 1256, 1264 (10th Cir. 2001) (affirming the district court's decision to use a flat percentage rate, without deductions, to calculate tax loss

––––––––––––––––––––

[28]  The Government contends that this analysis is "flawed" because § 2T1.1 "states that the amount of loss is that which was the object of the offense."  Letter from Cynthia A. Hawkins, Assistant United States Attorney, to David J. Salce, U.S. Probation Office, of April 29, 2005, 1-2, at 6 (responding to argument raised by co-defendant M. Saleem Khanani). While the Government is correct insofar as § 2T1.1 provides that "tax loss" is "the loss that would have resulted had the [tax] offense been successfully completed," USSG § 2T1.1(c)(1), this fact has no bearing on the issue at hand.  The issue presented by Mr. Portlock's objection is not whether "tax loss" includes all the loss that would have resulted had his tax offenses been successfully completed (which they were), but whether "tax loss" contemplates legitimate but unclaimed deductions.

[29]  This determination is bolstered by the fact that, in 1993, the Sentencing Commission not only amended the tax guideline to make provision for "a more accurate determination" of "tax loss" but deleted language in the commentary which stated that one of the aims of calculating "tax loss" purely on the basis of a default marginal tax rate was to "make irrelevant the issue of whether the taxpayer was entitled to offsetting adjustments that he failed to claim."  Martinez-Rios, 143 F.3d at 671 (quoting USSG § 2T1.1 cmt. n.4).

where the defendant had no evidence to show that he could have claimed legitimate deductions); see also USSG § 2T1.1 cmt. n.1 (providing for application of a presumptive tax rate "unless the *government or defense* provides sufficient information for a more accurate assessment of the tax loss") (emphasis added).

In this case, to determine a "tax loss" that takes into account lawful but unclaimed deductions, I need not look any further than the Government's $1.2 million calculation,[30] an amount which properly accounts for the wages that Mr. Portlock and his coconspirators paid to their undocumented workers.[31]  Under the tax table, a tax loss of this amount translates to a base offense level of nineteen (19).

### D.  MULTIPLE GROUP ADJUSTMENT

---

[30] The Government correctly asserts that Mr. Portlock's tax scheme also deprived the State of Florida of $259,978.  However, for the purpose of determining the base offense level for Mr. Portlock's tax offenses, this additional amount has no significance.  See USSG § 2T4.1(N)-(O) (noting that a loss less than or equal to $1.5 million yields a base offense level of nineteen (19)).

[31]  There is no basis whatsoever in either fact or law for Mr. Portlock's additional contention that the tax loss calculation for his offenses should only reflect 34% of the amount in income taxes he and his coconspirators evaded.  See Doc. 1006, at 13 ("Objection #2, Paragraph 69").  As an accountant, Mr. Portlock was undoubtedly well poised to foresee the tax consequences of his and his coconspirators' criminal behavior.  There is, therefore, no foul, at least from the perspective of the Guidelines, in holding him responsible for those consequences.  See USSG § 1B1.3(a)(1)(B) ("Relevant Conduct (Factors that Determine the Guidelines Range)) (instructing that conduct relevant to determining an advisory sentencing range includes, "in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense").

Under the formula for multiple group adjustment set forth in § 3D1.4, the Probation Office added three levels to Mr. Portlock's combined offense level.  However, following the grouping of Mr. Portlock's tax and fraud offenses, § 3D1.4 now prescribes one unit to the tax and fraud offenses for having the highest offense level of any of the groups of offenses, § 3D1.4(b), and one unit to the immigration offense for having an offense level within one to four levels less than the offense level for the tax and fraud offenses.  Under the unit-to-level conversion table in § 3D1.4, two units equate to two additional levels.

### D.  COMBINED OFFENSE LEVEL

Based on the analysis set forth above, the combined offense level for Mr. Portlock's offenses equals twenty-seven (27).

### E.  CRIMINAL HISTORY SCORE

As reflected in the PSR, Mr. Portlock has no criminal history and must, therefore, be assigned a criminal history score of zero.

### F.  ADVISORY SENTENCING RANGE

Based on the cross-referencing of Mr. Portlock's combined offense level and criminal history category on the Guidelines sentencing grid, I determine that the advisory sentencing range for Mr. Portlock is seventy (70) to eighty-seven (87) months.

## V.  MR. PORTLOCK'S MOTION FOR DEPARTURE
## FROM THE ADVISORY GUIDELINES SENTENCING RANGE[32]

Mr. Portlock moves for a downward departure from the advisory guidelines range on five grounds: 1) his family circumstances; 2) his volunteer work and community support; 3) consequences to his business; 4) overstatement of relevant conduct; and 5) a combination of factors and departures in general.  Only the first of these grounds warrants discussion.

Mr. Portlock contends that his presence is essential to the well-being of his three 12-year old adopted children, Jesse, Valiery, and Natalia, all of whom have emotional and developmental problems.  In support of this contention, Mr. Portlock's wife, Judy Portlock ("Mrs. Portlock"), and two professional witnesses, a psychiatrist and psychologist, provided testimony on Mr. Portlock's behalf in the post-trial sentencing phase of these proceedings.

---

[32] Following Booker and the Eleventh Circuit's opinion in United States v. Crawford, 407 F.3d 1174, 1182-83 (11th Cir. 2005), it appears possible to view the present role of departures in sentencing in two different ways: (1) that departures are part of "calculating an advisory guideline range," see id. at 1182 ("Lack of criminal sophistication is not a permissible ground for a downward departure *in calculating an advisory guideline range.*") (emphasis added); or (2) downward departures of the same variety that existed pre-Booker may be made *from* the advisory guidelines range and will be subjected to the same standard of review that prevailed pre-Booker, see id. at 1183 ("On remand, the district court must calculate an advisory guideline range that includes the more than minimal planning enhancement and considers whether to grant a downward departure *from that advisory guideline range* consistent with this opinion.") (emphasis added); But see id. at 1179 ("After it has made [the advisory Guidelines] calculation, the district court *may impose a more severe or more lenient sentence as long as the sentence is reasonable*") (emphasis added).

All three witnesses provided credible testimony regarding the considerable hardships, both past and present, that the Portlock children have endured.  The witnesses also testified, to my satisfaction, that Mr. Portlock plays a significant role in the lives of his children.

These facts alone, however, do not provide a sufficient foundation for downward departure.  Ordinarily, the barrier to granting a downward departure on the basis of family circumstances is the requirement that the circumstances be "extraordinary."  See USSG § 5H1.6; United States v. Allen, 87 F.3d 1224 (11th Cir. 1996).  This case, however, is different. The problem with Mr. Portlock's motion is not that he has failed to show that his family circumstances are "extraordinary."  I am convinced that they are.  The difficulty instead is in determining a sentence that takes account of Mr. Portlock's family circumstances and, at the same time, comports with the purposes of sentencing set forth in § 3553(a)(2).

While I am concerned that the incarceration of Mr. Portlock may substantially aggravate the already significant problems of his family, this concern is not a sufficient ground for me to abandon my obligation to impose a just and reasonable sentence on Mr. Portlock.  Contrary to Mr. Portlock's suggestion, this obligation would be far from satisfied by a sentence of only "home detention."  Among other things, such a sentence would fall well short of meeting the Sentencing Act's goal of "avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Mr. Portlock's co-defendant in this case, M. Saleem Khanani, has already been sentenced to a term of seventy (70) months in prison.  Thus, were I to now impose a sentence of only "home detention" on Mr. Portlock, the result would be a profound disparity in the sentences imposed on two similarly situated defendants.

Although a modest departure from the advisory Guidelines range for Mr. Portlock would not necessarily offend any of the principles contained in § 3553(a), the paradox of Mr. Portlock's argument for a downward departure is this: the more it succeeds in convincing me that his family circumstances are "extraordinary," the more persuaded I am that any reduction in his sentence which stops short of allowing him to avoid incarceration altogether will fail to prevent the type of regression in his children that those testifying on his behalf so urgently predicted will occur should he be incarcerated.  Faced with this troubling conundrum, I cannot help but conclude that Mr. Portlock's motion for downward departure must be denied.  See United States v. Wright, 218 F.3d 812, 815 (7th Cir. 2000) ("Reducing a sentence to assist a child's development makes most sense when the range is low to begin with and a small departure allows the parent to provide continuing care.").

## VI.  IMPOSITION OF A REASONABLE SENTENCE

My concluding obligation in this case is to impose a sentence that is "sufficient but not greater than necessary" to "reflect the seriousness of [Mr. Portlock's offenses], promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide [Mr. Portlock] with needed educational or vocational training and medical care."  Booker, 125 S. Ct. at 765 (citing § 3553(a)(2)).  "Factors to be considered in imposing [such] a sentence" include:

> (1) the nature and circumstances of [Mr. Portlock's offenses] and the history and characteristics of [Mr. Portlock];
> * * *
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the [advisory] sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement . . . [issued by the Sentencing Commission];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  It is also permissible to consider any "information concerning the background, character, and conduct" of Mr. Portlock in "imposing an appropriate sentence." 18 U.S.C. § 3661.

As reflected in the analysis set forth below, I have considered all of the above factors, and based on those factors, determine that the purposes of sentencing will be sufficiently satisfied by sentencing Mr. Portlock to a prison term of forty-eight (48) months, to be followed by two (2) years of supervised release, and by fining him in the amount of $12,000.[33]

## A.  THE SERIOUSNESS OF MR. PORTLOCK'S OFFENSES

Mr. Portlock contends that "'home detention' would . . . serve the societal need for reflecting the seriousness of [his] offense[s], as well as promoting respect for the law and providing just punishment."  Doc. 1004-2, at 26.  I disagree.

Mr. Portlock correctly observes that his immigration offense was not an especially severe one.  There is no evidence in the record that Mr. Portlock or his coconspirators engaged in gross exploitation of any illegal aliens or otherwise did anything to place any aliens in physical danger.  The worst that can be said of Mr. Portlock's treatment of his undocumented employees is that he and his coconspirators failed to pay them the legally

---

[33] I have opted not to make Mr. Portlock liable for restitution in the amount of the sales tax that he and his coconspirators deprived the State of Florida.  Previously, I determined that Mr. Portlock's co-defendant, Mr. Khanani, shall instead be liable for that amount because, in contrast to Mr. Portlock, Mr. Khanani owned the businesses that failed to pay the sales tax and, therefore, stood to gain much more by the evasion.

required rate for overtime.  Even this fact, however, is substantially ameliorated by evidence that the workers were paid at a rate equal to or greater than the federal minimum wage. Furthermore, the evidence presented in this case, through the testimony of Mr. Roger Bernstein, a former assistant counsel for the Immigration and Naturalization Service in Miami, Florida, is that cases involving conduct of the manner and scope committed by Mr. Portlock are ordinarily resolved through civil settlement proceedings.  Examination of case law, at least in this circuit, indicates, moreover, that when conduct like Mr. Portlock's is criminally prosecuted, it tends to be charged under the misdemeanor section of the immigration statute, 8 U.S.C. § 1324a ("Unlawful employment of aliens"), rather than the felony provision under which Mr. Portlock was charged, 8 U.S.C. § 1324(a)(1)(A)(iii)-(iv).  In view of these facts, I do not believe that the seriousness of Mr. Portlock's immigration offense, taken alone, merits a substantial prison sentence.

Mr. Portlock's tax and fraud offenses are, however, another matter.  Despite his considerable wealth and success, Mr. Portlock chose to use his gift for accounting, not for the benefit of society, but to facilitate the theft of hundreds of thousands of dollars from the State of Florida and the federal government.  No society that depends on its citizens to meet their tax obligations can tolerate such blatant disregard for its tax laws, particularly from persons entrusted to instruct others on how to comply with those laws.

Thus, to account for the seriousness of Mr. Portlock's tax and fraud offenses and to promote respect for the nation's tax laws, I must sentence Mr. Portlock to a prison term of substantial length.  Such term, however, need not fall within the length recommended by the Guidelines.  Rather, upon careful consideration of the advisory Guidelines sentencing range

and "other kinds of sentences available," I find that a sentence of forty-eight (48) months is sufficient but not greater than necessary to reflect the seriousness of Mr. Portlock's offenses.[34]

_____

[34] This conclusion squares with my belief that I should consider the extent to which the standard of proof for sentencing-enhancing facts varies from the standard of proof required for jury convictions. Pursuant to the tax guideline, I calculated the tax loss resulting from Mr. Portlock's tax offenses to be $1.2 million; this tax loss, in turn, formed the sole basis for my determination that the base offense level for Mr. Portlock's tax offenses was nineteen (19). The only part of this amount, however, that the Government proved with certainty was $473,677. The remaining amount is made up of taxes that should have been withheld from the paychecks of the undocumented employees, a substantial portion of which could have been returned to the employees in the form of tax refunds. Thus, by imposing a sentence lower than the ranged recommended by the Guidelines, I avoid punishing Mr. Portlock on the basis of an amount that was not only not proven beyond a reasonable doubt, but was not proven with any degree of certainty.

A sentence of forty-eight (48) months also sufficiently accounts for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(7). Initially, there were six individual defendants charged in this case. Jesse Maali died before the case proceeded to trial. Khan Aslam ("Mr. Aslam") and Saeedullah Awan ("Mr. Awan") pled guilty to the charge of conspiracy to conceal, harbor, and shield illegal aliens from detection and to encourage and induce illegal aliens to reside in the United States. The Government filed motions pursuant to USSG § 5K1.1 asking me to recognize substantial assistance that Mr. Aslam and Mr. Awan gave the Government in this case. The Government's motions were granted and both defendants were sentenced to terms of probation. Mahmood Jamal was charged with misprision of a felony. The Government also filed a § 5K1.1 motion on behalf of Mr. Jamal. The Government's motion was also granted in Mr. Jamal's case and he, too, was sentenced to a term of probation.

The only other co-defendant in this case is Mr. Khanani. Mr. Khanani was convicted on forty-two counts of encouraging or inducing aliens to reside in the United States (Counts 1, 4-6, 8-9, 12-14, 16,-22, 24,-32, 34-37, 39-43, 45-51, and 53), one count of conspiring to conceal, harbor, or shield from detection, or to encourage or induce aliens to illegally come to, enter, or reside in the United States (Count 54), one count each of wire and mail fraud (Counts 56-57), one count of conspiring to attempt to evade federal taxes (Count 58), and thirteen counts of attempting to evade federal employment or federal income taxes (Counts 59-71) which were all charged in the Government's Third Superceding Indictment. Mr. Khanani has been sentenced to a period of seventy (70) months in prison and been ordered to pay restitution to the State of Florida in the amount of $259,978.

## B.  ADEQUATE DETERRENCE

After carefully considering the advisory Guidelines sentencing range and "other kinds of sentences available," I conclude that a sentence of forty-eight (48) months is sufficient but not greater than necessary to adequately deter violation of the immigration, fraud, and tax laws.

## C.  PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

Mr. Portlock has no criminal past other than the convictions in this case.  Based on this fact and evidence presented at sentencing concerning the character of Mr. Portlock, I am convinced that Mr. Portlock poses no threat to the public.  This fact reinforces my determination that a sentence within the advisory Guidelines range need not be imposed and that a sentence of forty-eight (48) months is sufficient.

---

In determining a reasonable sentence for Mr. Portlock, I have considered the sentences received by Mr. Aslam, Mr. Awan, Mr. Jamal, and Mr. Khanani.  The fact that the first of three co-defendants received sentences less severe than the sentence now imposed on Mr. Portlock reflects that the conduct of these co-defendants was less serious than Mr. Portlock's.  Unlike Mr. Portlock, these co-defendants did not play an instrumental role in organizing and implementing the criminal scheme in which they and Mr. Portlock engaged.  Mr. Awan and Mr. Aslam, in fact, were lower-level employees who participated in the criminal scheme only after they were instructed to do so.  Although Mr. Jamal was directly involved with the management of the businesses that unjustly profited as a result of the defendants' criminal scheme, he distanced himself from that role after becoming aware of the scheme's scope.  The conduct of Mr. Khanani, on the other hand, was more serious than Mr. Portlock's and, therefore, has been met with a stiffer sentence.  Among other things, Mr. Portlock made no efforts to impede the federal authorities in the investigation of his and the other defendants' criminal conduct and stood to gain significantly less than Mr. Khanani as a result of their collective criminal conduct.

**D.  EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT**

Mr. Portlock has demonstrated no need for educational or vocational training, medical care, or other correctional treatment.  Thus, were this the only sentencing purpose that I had to consider, an alternative sentence, such as the imposition of fine, might suffice.  However, as I have already explained, the need to promote respect for the law and to provide adequate deterrence to serious criminal conduct requires that I impose a substantial prison sentence.

## VII.  CONCLUSION

Having considered all of the factors set forth in 18 U.S.C. § 3553(a), I order that Mr. Portlock shall be confined to the custody of the Federal Bureau of Prisons for a period of forty-eight (48) months and shall be fined in the amount of $12,500.  I further order that, upon Mr. Portlock's release from prison, he shall be committed to supervised release for a period of two (2) years.

**DONE and ORDERED** in Orlando, Florida on this 7th day of September, 2005.

Copies furnished to:

United States Marshal

United States Attorney

United States Probation Office

United States Pretrial Services Office

Counsel for Defendant

JOHN ANTOON II
United States District Judge

JESSE ISSA MAALI

M. SALEEM KHANANI

KHAN ASLAM

SAEEDULLAH AWAN

MAHMOOD JAMAL

BIG BARGAIN WORLD, INC.

SS MART, INC.

JEANS UNLIMITED, INC.

DENIM UNLIMITED, INC.

BARAKAT CORPORATION

BARAKAT INTERNATIONAL, INC.

DAVID PORTLOCK